Without further ado, I call the first case, 21-1330CV, Isaly v. Boston Globe Media Partners LLC. And I understand that for the appellant, we have Mr. Lewis, is that right? Yes, good afternoon. Good afternoon, and Mr. Lewis, you have 10 minutes and you, I understand, would like to reserve two minutes for rebuttal, is that right? That is correct. Very good, Mr. Lewis, please proceed. Good afternoon, I'm Alan Lewis, and I represent Sam Isaly. I'm here to ask that the court reinstate his defamation complaint. Judge Swain ruled that Mr. Isaly failed to plausibly plead the fault element of his claim here, which is gross irresponsibility. I'd like to emphasize five aspects of the complaint and the defamatory article that demonstrate otherwise. I'll start with paragraph 24 of the complaint, which clearly pleads facts, detailed facts, that gave BGMP reasons to doubt the most serious accusation in the article. That, of course, is that Mr. Isaly repeatedly used electronic equipment to expose his company's female staff to pornography in the workplace, such as, quote, Isaly would embed pornographic images or videos. Now, the first fact that gave BGMP reasons to doubt this accusation was that it knew, through its reporter, that Mr. Isaly was paralyzed from the neck down, and therefore physically incapable of embedding videos or images in emails. Sorry, counsel, can I just ask you? I know this is a few years ago, but, you know, I don't know how recently Siri came online, but haven't there been voice-activated assistants for computers for a long time? And even more to the point, hasn't your client had live human assistants who were available to assist him, even at the time? This was in 2009 and 2010, when technology is not as advanced as it was today, and at the time, he didn't send his own emails ever. Even- But he had people to do his bidding, right? The article- Didn't he have people who did it for him? Of course. The source of the claimed, named source of the article, Delilah Burke, sent emails for Mr. Isaly all the time. But she, according to the article, according to the article, Mr. Isaly embedded pornographic videos and images in emails that he sent to her on an almost daily basis. The article reports that Isaly texted her on nights and weekends with repetitive demands. There's no reasonable reading of the article in which the article describes anybody else doing this other than Sam Isaly by himself. If, in fact, something else was going on, such as Isaly was going to other staff at OrbaMed and supposedly having them send out pornographic videos and emails, that would have been a different story, but it's just not the story that the article told. And Mr. Isaly, as the plaintiff, is entitled to the reading of the article that is most consistent with his complaint. So without a doubt, anybody reading this article would conclude that it says that Isaly is there repeatedly embedding videos and images in emails and sending them to his secretary. Since she worked at the company for a year and a half, and this occurred on an almost daily basis, supposedly, that would mean that there were 500 such emails. But the Globe's reporter observed for himself that Mr. Isaly's hands are locked like a clenched fist. He can't send emails, he can't embed videos in emails, and BGMP knew this. Now, while BGMP may contend that it didn't doubt the article, that's a factual issue for development through discovery. At this point, what matters is that the complaint clearly pleads facts that make it plausible to conclude that BGMP's publication of the allegations was irresponsible. So there's a second- Councillor, if I may, in the interview with the reporter, Mr. Isaly was accompanied by a public relations person. Did either one of them say that his disabilities would render him incapable of doing the things that were alleged against him? Yes, Jonathan, well, that person, Jonathan Silverstein, who's been Mr. Isaly's colleague for decades, said that he doesn't do keyboard things himself, he needs assistance for all of that. Carlos Godoy, who's Mr. Isaly's assistant, was introduced to the reporter after Mr. Isaly was interviewed, and he told him, without actually even having heard the prior parts of the interview, I type all of his emails for him. So Garda saw it, he shook hands, he tried to shake hands with Mr. Isaly, he could see how clenched they were, how frozen they were. He was told by two people that Mr. Isaly doesn't himself use electronic equipment, that is, he has other people do that for him. But if he has other people doing it for him, what is the importance of the distinction as to whether he's using his fingers to type it and whether he's dictating to somebody who is typing it in? Well, the article doesn't really permit the reasonable reading, that's what was happening here. It said that Mr. Isaly was doing this on nights and weekends, presumably from home. It says that he was doing it on an almost daily basis. It said Isaly would embed. And if there was something going on at OrbaMed where he was going to various other- Oh, I'm sorry, counsel, by your view, your client has never sent an email. So that if one of his, I don't know, counterparts in the deal said, well, I got an email, Isaly sent me an email, you would say that is wrong. He's never sent an email in his life. He dictated an email that someone sent on his behalf and you are misspeaking if you say that Mr. Isaly sent you a message. That is simply- At the time, his assistants sent all of his emails. Right, and that's what I'm saying. And then you would say, if one of his counterparts said, well, Isaly sent me an email, you would say, no, no, no, he did not send you an email. Someone else sent you an email, perhaps at Mr. Isaly's behest. I mean, it seems like we're getting into semantics here. Respectfully, I don't think so because the article portrays Mr. Isaly as himself sending these pornographic videos, not finding others within orbit. The defamation is not how he sent it. It's that he was responsible for the sending of pornography. And so to the extent that you're arguing over whether or not the reporter should have realized that he didn't do it personally, I'm not sure how that satisfies defamation. I thought the whole point here was that he's being accused of having transmitted pornography to his subordinate. He is- If you acknowledge that he sends electronic communications he just needs assistance to do it. That's the problem I'm having with how you've got a colorable claim here. Well, there are four other reasons looking at this. I just want to hear those, but is there anything more I should be aware of with respect to the point we've been discussing so far? I think I've said it, Judge Fradji. The article doesn't portray Mr. Isaly as asking others to send out 500 pornographic videos for him. Is the method he used defamatory? The defamation is that he himself embedded pornographic videos 500 times in emails that he sent to Delilah Burke. But the second reason- If he had an assistant do it, you're still saying you have a claim here. No, I'm saying that the Globe was relied on a report. It said it relied on a report from someone who told the Globe, Isaly embedded these videos and emails that he sent to me. They weren't reporting that he had somebody else do this for her. Given the number of times that it happened, given that it's nights and weekends, it's not a reasonable reading of what they reported that others did it for him. And that's just the first reason why we've plausibly pled that the Globe had reasons to doubt. Yes, I think you're- Counsel, let me just, and I know we've taken up some of your time with our questions, and I do thank you for answering them directly. You've reserved two minutes for rebuttal. If you'd like to use some of that time right now, that's fine. Or if you'd like to hold onto that for rebuttal, either way, it's your choice. I'll use 30 seconds. The second reason is that the Globe looked away from crucial information that was easily accessible. That is, they published the claim in spite of failing to corroborate the existence of the hundreds of pornographic emails or even a single email. And there was an obvious way to do that. The reporter had direct access to both the person who said she received hundreds of these pornographic videos and the management of the business from which they were sent, yet BGMP failed to corroborate the existence of the emails and didn't even try. And in the words of the Chappadoke case, that was a failure to follow sound journalistic practices. I'll reserve the rest of my time for rebuttal. Thank you. Very good. Thank you very much. We will hear from counsel for the appellee. Let's see. Do we have Mr. Albano on the line? Yes. Good afternoon. May it please the court. My name is John Albano here on behalf of the defendant. The district court did correctly apply the gross irresponsibility standard and correctly ruled that based on the submissions, both of the complaint itself and the transcript that the plaintiff submitted, there is no plausible allegation of gross irresponsibility. The case started out, if you look at paragraphs nine and one of the complaint, there were, I believe, 12 paragraphs quoted from the article that were alleged to be examinatory per se. All but three of those are out of the case now. There's no argument anymore about the vibrator that was left in the briefcase that Ms. Burke said was the last straw before she quit. Mr. Isley now says that the statement about hardcore porn being played over the trading room screens was not even specifically directed at him. And the report that he palpated the breast implants also as fallen by the wayside. So what's left? I believe there's three statements that are left in the case. One is that Mr. Isley called Ms. Burke into his office where she saw a pornographic image on his own desk computer monitor. The second one is that he would sprinkle his to-do list with dirty jokes and cryptic setups so that she'd be exposed to something lewd on the internet. And the third is the one counsel has been focusing on that he embedded pornographic images or videos in seemingly innocent emails. The district court considered all of these. Excuse me, counsel, but it's also alleged that these things were done on nights and weekends, correct? Yes, John, yes. And, you know, to step back in the context that the district court applied here, she first said, okay, there's no dispute that there were five OrbaMed former employees who were interviewed by the Globe. One on the record, Ms. Burke, for confidential sources. There's no dispute that Ms. Burke had personal knowledge of Mr. Isley's behavior. She was his personal assistant for 18 months. And there's no dispute that she said what the Globe said she said, because we know that because Mr. Isley has sued her in state court for making those statements. There's also no allegation in the complaint countering the fact reported in the article that Ms. Burke shared with the Globe contemporaneous emails she had sent to herself back in the day, documenting things that she received from Mr. Isley like hook or joke, dirty pick. And the complaint does not contest that as the article reported, there was a corroborating witness to whom the Globe spoke who confirmed that Ms. Burke had spoken about these things and that they troubled her. Counsel, do you concede that the reporter was advised by Mr. Isley or by someone in his employee that he lacked the capacity to do these things or to handle electronic devices? I would respectfully say that the transcript of the interview does not support that claim. Yes, people said that Mr. Isley at time had assistance, keyboard assistance. There's a line about that. There's also, and this is reported in the- Excuse me, when you say keyboard assistance, does the word assistance end in C-E or T-S? I couldn't swear to that. The notion I grabbed, I couldn't swear to which it is, Your Honor, for now. The notion was that people were available to help him with keyboard tasks. Even I have people available to help me with keyboard tasks. I could use some. But here, to get back to your question, what the transcript shows is that an iPad was brought into Mr. Isley during the interview. Mr. Isley admitted that he can use a fork, albeit awkwardly, to eat. And at one point in the interview, he volunteered that he had joined a steak eating contest to prove that it could be done. None of that conveyed the notion that it was physically impossible for him to do these things. And if I may go a bit further on that, you will see in the transcript the questions and answers that say, did you embed pornographic images and videos? The answer is no. His colleagues are there. His crisis management person is there. The interview goes on for 90 minutes, and no one says, by the way, this is impossible. It's like you're asking a blind man, has he seen the movie? That this could not happen. Not only that, after the interview is over and before publication, one of Mr. Isley's partners emails the Globe and says, and I'm paraphrasing, it's in the record, I hope you'll be fair and focus on the person responsible not the entire firm. That is not, that is a far cry, let me say, from saying none of this is even physically possible. Mr. Isley makes a point in his brief about being able to text. We point out that he said he could text. And Mr. Isley says, well, that doesn't matter because I actually didn't start texting until 2012. And here is where I would suggest he is conflating two separate elements of the tort, falsity, which was not at issue below or on appeal, and gross irresponsibility. And the reason I say that is the point from a gross irresponsibility standard about the fact that Mr. Isley is using, is can text in 2012, is that it was not unreasonable or irresponsible for a Globe reporter to say, 2012, Ms. Burke worked there for 18 months starting sometime in 2009. We are in the same era in which those kinds of technologies were available, particularly, maybe not to all of us in the country, but particularly to someone with the means that Mr. Isley has. The last thing I'd add on this point is that you look at paragraph 13 of the complaint. There is an acknowledgement that Mr. Isley can use his arms and hands enough to transfer out of his wheelchair, and this is part of the phrase, and use his arms and hands. So am I suggesting that he is an able-bodied person? No, no, and please, I hope I'm not giving that impression. What I am definitely suggesting is that it was not irresponsible for the Globe to, after talking to five former employees, including a woman with intimate personal knowledge of his office behavior, and a 90-minute interview with Mr. Isley and his colleagues, and the other corroboration that they received from confidential sources and from the friend of Ms. Burke who confirmed what had happened, that yes, this was a responsible thing to report along with Mr. Isley's denials, and along with the clarification that none of these people suggested that there had been any improper touching on the part of Mr. Isley. So I see my time is almost up. I think the best way for me to respond is that the, to conclude is to say that the careful analysis of the district court here should be affirmed on appeal and was correct as a matter of law. Thank you. Thank you, counsel. Mr. Lewis, you've reserved, I guess we're at one and a half minutes. We'll set the clock. You're on mute, Mr. Lewis, and we'll give you the full minute and 30 once you get back on. Thanks. First thing I want to observe is that there was no response to my point that the Globe didn't corroborate the existence of one of these 500 plus emails, or even tried to do so, even though they had access to the person who said she received them and to the company from which they came and to respond to one point that we concede that Ms. Burke said these things, we absolutely do not. And we're actually confident that in discovery, she would deny having reported the receipt of these pornographic videos from Mr. Isley. Another point that makes it at least plausible that this publication was grossly irresponsible is that the article created a deliberately false picture of Mr. Isley's condition. Why do that? Why describe him as paralyzed from the waist down when he's paralyzed from the neck down? Paragraph 24's facts must be treated as true. He has an inability to grasp with his fingers. He did not demonstrate fine hand and finger dexterity needed to do things, any keyboard related things. Carlos Godoy, his assistant said in the interview, because of his condition, I type all of his emails. And Mr. Godoy didn't even know that there was an inquiry into the sending of emails. But surely there's some significance to the fact that he said he typed all of his emails. That is to say they were his emails. Mr. Isley's emails. Yes. They were still his emails. I'm going back to the point, he didn't send these things himself and the article suggests that he does. And we're entitled to that reading of the article on a motion to dismiss. I would say that the rest of the arguments that you've heard fit at the factual stage. Here, we have to look at the complaint and see does it plead enough facts that make it plausible that EGMP jumped to a conclusion, that it didn't do enough investigation. They didn't follow up with a physiatrist. They didn't try to get the emails, not one of them. What excuse is there for a publication to report somebody's told me they received 500 of these things and they don't try to confirm the existence. At minimum- Mr. Lewis, you've come to the end of your time. If you'd like to say, wrap up a little. Sure. The district court's decision to dismiss gave lip service only to the principle that the well-plaid allegations in a complaint must be deemed to be true on a motion to dismiss. The complaint thoroughly pleads various facts that make the decision to publish this article and the way it was published, the way that Mr. Isley was deliberately misrepresented. At minimum, those give rise to an inference, to a permissible inference that they were grossly irresponsible. Whether they were or not is for development at the trial and discovery through the testimony of witnesses. Right now, Mr. Isley is entitled to his day in court.  We will reserve decision. Let us-